William S. O'Hare (#082562)
wohare@swlaw.com
Deborah S. Mallgrave (#198603)
dmallgrave@swlaw.com
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, California  92626-7689
Telephone:   (714) 427-7000
Facsimile:    (714) 427-7799

John E. Nathan (*pro hac vice*)
jnathan@paulweiss.com
Catherine Nyarady (*pro hac vice*)
cnyarady@paulweiss.com
Brian P. Egan (*pro hac vice*)
began@paulweiss.com
Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel:   212-373-3000
Fax:   212-757-3990

Attorneys for Defendants and Counterclaim-Plaintiffs
Edwards Lifesciences Corporation,
Edwards Lifesciences LLC, and
Edwards Lifesciences (U.S.) Inc.

Attorneys for Counterclaim-Plaintiff
Edwards Lifesciences PVT, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA

| | |
|---|---|
| MEDTRONIC COREVALVE LLC, MEDTRONIC CV LUXEMBOURG S.A.R.L., AND MEDTRONIC VASCULAR GALWAY LTD., <br><br> Plaintiffs, <br><br> v. <br><br> EDWARDS LIFESCIENCES CORPORATION, EDWARDS LIFESCIENCES LLC, AND EDWARDS LIFESCIENCES (U.S.) INC., <br><br> Defendants. | CASE NO. SACV11-00961 JVS (MLGx) <br> Hon. Joseph V. Selna <br> Magistrate Judge Marc L. Goldman <br><br> **ANSWER AND COUNTERCLAIMS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> COMPLAINT FILED:  June 27, 2011 |

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1  EDWARDS LIFESCIENCES
2  CORPORATION, EDWARDS
   LIFESCIENCES LLC, EDWARDS
3  LIFESCIENCES (U.S.) INC., AND
   EDWARDS LIFESCIENCES PVT,
4  INC.,

5          Counterclaim-Plaintiffs,

6  v.

7  MEDTRONIC COREVALVE LLC,
8  MEDTRONIC CV LUXEMBOURG
   S.A.R.L., MEDTRONIC
9  VASCULAR GALWAY LTD.,
   MEDTRONIC, INC., AND
10 MEDTRONIC VASCULAR, INC.

11         Counterclaim-Defendants

12

13         Defendants and Counterclaim-Plaintiffs Edwards Lifesciences Corporation,

14 Edwards Lifesciences LLC ("Edwards LLC") and Edwards Lifesciences (U.S.) Inc.

15 (collectively, "Edwards"), file this Answer and Counterclaims Counts I and II in

16 response to Plaintiffs Medtronic CoreValve LLC, Medtronic CV Luxembourg

17 S.a.r.l. and Medtronic Vascular Galway Ltd. (collectively, "Medtronic Plaintiffs")

18 Complaint for Patent Infringement (hereinafter, "the Complaint"), and

19 Counterclaim-Plaintiffs Edwards LLC and Edwards Lifesciences PVT, Inc.

20 ("Edwards PVT") file Counterclaim Count III for infringement of United States

21 Patent No. 8,002,825 by the Medtronic entities as hereinafter stated.

## ANSWER

## INTRODUCTION

24         1.      Edwards admits only that the Complaint purports to bring an action for

25 patent infringement.

26         2.      Edwards is without knowledge or information sufficient to form a

27 belief as to the truth of the allegations of Paragraph 2 of the Complaint, and

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1   accordingly those allegations are denied.

2       3.     Edwards is without knowledge or information sufficient to form a

3   belief as to the truth of the allegations of Paragraph 3 of the Complaint, and

4   accordingly those allegations are denied.

5       4.     Edwards is without knowledge or information sufficient to form a

6   belief as to the truth of the allegations of Paragraph 4 of the Complaint, and

7   accordingly those allegations are denied.

8       5.     Edwards admits the allegations of Paragraph 5 of the Complaint.

9       6.     Edwards admits the allegations of Paragraph 6 of the Complaint.

10      7.     Edwards admits the allegations of Paragraph 7 of the Complaint.

11  **JURISDICTION AND VENUE**

12      8.     Edwards admits only that the Medtronic Plaintiffs purport to invoke

13  the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

14      9.     Edwards admits only that venue in this District is proper.

15      10.    Edwards admits only that this Court has personal jurisdiction over

16  each of the named Defendants.  Edwards denies every other allegation of Paragraph

17  10.

18  **FACTUAL BACKGROUND**

19      11.    Edwards admits that United States Patent No. 7,892,281 ("the Seguin

20  '281 patent") was issued on February 22, 2011, is entitled "Prosthetic Valve for

21  Transluminal Delivery," and that a copy of the Seguin '281 patent is attached to the

22  Complaint as "Exhibit 1."  Edwards denies the remaining allegations of Paragraph

23  11 of the Complaint.

24      12.    Edwards is without knowledge or information sufficient to form a

25  belief as to the truth of the allegations of Paragraph 12 of the Complaint, and

26  accordingly those allegations are denied.

27      13.    Edwards is without knowledge or information sufficient to form a

28

Answer and Counterclaims
Case No. SACV11-00961

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

belief as to the truth of the allegations of Paragraph 13 of the Complaint, and accordingly those allegations are denied.

14.     Edwards is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14 of the Complaint, and accordingly those allegations are denied.

15.     Edwards is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15 of the Complaint, and accordingly those allegations are denied.

## COUNT 1

16.     Edwards restates, realleges and incorporates by reference its responses to the allegations set forth in Paragraphs 1 through 15.

17.     Edwards denies the allegations of Paragraph 17 of the Complaint.

18.     Edwards denies the allegations of Paragraph 18 of the Complaint.

19.     Edwards denies the allegations of Paragraph 19 of the Complaint.

20.     Edwards denies the allegations of Paragraph 20 of the Complaint.

21.     Edwards denies the allegations of Paragraph 21 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense (Failure to State a Claim)

22.     Medtronic Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense (Noninfringement)

23.     Edwards has not infringed, contributorily infringed or actively induced the infringement of any valid claim of the Seguin '281 patent, either literally or under the doctrine of equivalents, and does not do so now.

### Third Affirmative Defense (Invalidity)

24.     Edwards is informed and believes, and thereupon alleges, that the Seguin '281 patent is invalid for failure to meet one or more of the requirements of

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Answer and Counterclaims
Case No. SACV11-00961

patentability under United States Code Title 35, including, without limitation, one or more of the requirements of 35 U.S.C. §§ 102, 103 and/or 112.

### Additional Affirmative Defenses

25.     Edwards expressly reserves the right to assert and pursue additional defenses resulting from discovery and/or Edwards' ongoing investigations.

### PRAYER FOR RELIEF

WHEREFORE, Edwards prays for relief as follows:

A.     That the Court enter judgment in favor of Edwards, and against Medtronic Plaintiffs;

B.     That the Court enter judgment that Edwards has not infringed the Seguin '281 patent, either literally or under the doctrine of equivalents;

C.     That the Court enter judgment that the Seguin '281 patent is invalid;

D.     That the Court deny any and all of Medtronic Plaintiffs' requests for injunctive relief;

E.     That the Court dismiss Medtronic Plaintiffs' Complaint in its entirety, with prejudice;

F.     That the Court find this case exceptional under 35 U.S.C. § 285, and award Edwards its reasonable attorneys' fees, costs and disbursements; and

G.     That the Court grant Edwards such other relief as the Court deems just and proper.

### JURY DEMAND

Edwards demands a trial by jury on all issues so triable in the Complaint.

Answer and Counterclaims
Case No. SACV11-00961

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

## COUNTERCLAIMS

## INTRODUCTION

1.     These Counterclaims are for declaratory relief with respect to the Seguin '281 patent (Counts I and II), and for willful infringement of United States Patent 8,002,825 ("the Cribier '825 patent") owned and licensed by Edwards PVT and Edwards LLC as hereinafter stated (Count III).  These Counterclaims arise under the patent laws of the United States, 35 U.S.C. § 101 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## JURISDICTION AND VENUE

2.     The Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

3.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and (d), and 1400 (b).

4.     Counterclaim-Plaintiffs Edwards Lifesciences Corporation, Edwards LLC, Edwards Lifesciences (U.S.) Inc. and Edwards PVT are each organized and existing under the laws of Delaware, with their principal places of business in Irvine, California.

5.     Upon information and belief, Counterclaim-Defendant Medtronic CoreValve LLC is a limited liability corporation organized and existing under the laws of Delaware, with its principal place of business in Irvine, California.

6.     Upon information and belief, Counterclaim-Defendant Medtronic CV Luxembourg S.a.r.l. is a limited liability company organized and existing under the laws of Luxembourg, with its principal place of business in Luxembourg.  Upon information and belief, Medtronic CV Luxembourg S.a.r.l. is subject to the jurisdiction of this Court, *inter alia*, by virtue of invoking the jurisdiction of this Court by filing this action, and by doing business in this District.

7.     Upon information and belief, Counterclaim-Defendant Medtronic

Answer and Counterclaims
Case No. SACV11-00961

Vascular Galway Ltd. is a company organized and existing under the laws of Ireland, with its principal place of business in Galway, Ireland.  Upon information and belief, Medtronic Vascular is subject to the jurisdiction of this Court, *inter alia*, by virtue of invoking the jurisdiction of this Court by filing this action, and by doing business in this District.

8.     Upon information and belief, Counterclaim-Defendant Medtronic, Inc. is a corporation organized and existing under the laws of the state of Minnesota and having its principal place of business in Minneapolis, Minnesota.  Upon information and belief, Medtronic, Inc. is subject to the jurisdiction of this Court, *inter alia*, by doing business in this District.

9.     Upon information and belief, Counterclaim-Defendant Medtronic Vascular, Inc. is a corporation organized and existing under the laws of the state of Delaware and having its principal place of business in Santa Rosa, California. Upon information and belief, Medtronic Vascular, Inc. is subject to the jurisdiction of this Court, *inter alia*, by doing business in this District.

## COUNT I
## DECLARATORY JUDGMENT OF
## NONINFRINGEMENT OF THE SEGUIN '281 PATENT

10.     Edwards restates, realleges and incorporates by reference the allegations made in the Affirmative Defenses and in Paragraphs 1-9 of the Counterclaims above.

11.     An actual controversy exists between Edwards and Counter-Defendants Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l. and Medtronic Vascular Galway Ltd. over the alleged infringement of the Seguin '281 patent.

12.     Edwards has not infringed, contributorily infringed or actively induced the infringement of any valid claim of the Seguin '281 patent, either literally or

Snell & Wilmer
— L.L.P. —
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Answer and Counterclaims
Case No. SACV11-00961

under the doctrine of equivalents.

13.     Edwards has not willfully infringed, contributorily infringed or actively induced the infringement of any valid claim of the Seguin '281 patent, either literally or under the doctrine of equivalents.

**COUNT II**

**DECLARATORY JUDGMENT OF**

**INVALIDITY OF THE SEGUIN '281 PATENT**

14.     Edwards restates, realleges and incorporates by reference the allegations made in its Affirmative Defenses and in Paragraphs 1-13 of Edwards' Counterclaims above.

15.     An actual controversy exists between Edwards and Counterclaim-Defendants Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l. and Medtronic Vascular Galway Ltd. over the invalidity of the Seguin '281 patent.

16.     All claims of the Seguin '281 patent are invalid because they fail to comply with one or more requirements of United States Code Title 35, including, without limitation, one or more requirements of 35 U.S.C. §§ 102, 103 and/or 112.

**COUNT III**

**INFRINGEMENT OF THE CRIBIER '825 PATENT**

17.     Counterclaim-Plaintiffs Edwards LLC and Edwards PVT restate, reallege and incorporate by reference the allegations of Paragraphs 1-16 above.

18.     On August 23, 2011, the Cribier '825 patent (Exhibit A hereto), entitled "Implantable Prosthetic Valve for Treating Aortic Stenosis," was duly and legally issued and names Alain Cribier and Brice Letac as inventors.  Counterclaim-Plaintiff Edwards PVT is the assignee of the Cribier '825 patent, and Counterclaim-Plaintiff Edwards LLC is the exclusive licensee of the Cribier '825 patent for the field of all cardiovascular applications, including the right to sue and recover for any and all past infringement thereof in the field of all cardiovascular applications.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Answer and Counterclaims
Case No. SACV11-00961

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

19.     Upon information and belief, and in violation of 35 U.S.C. § 271, Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc. and/or Medtronic Vascular, Inc. have been and are now infringing the Cribier '825 patent by manufacturing, using, importing, selling, offering to sell and/or supplying heart valve prostheses covered by one of more claims of the Cribier '825 patent, including without limitation products designated as the Generation 3 ReValving system.

20.     Upon information and belief, and in violation of 35 U.S.C. § 271, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc. and/or Medtronic Vascular, Inc. had knowledge of the Cribier '825 patent, and have acted with specific intent to actively induce Medtronic CoreValve LLC to directly infringe the Cribier '825 patent by, *inter alia*, manufacturing the Generation 3 ReValving system.

21.     Upon information and belief, and in violation of 35 U.S.C. § 271, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc., and/or Medtronic Vascular, Inc. have contributorily infringed the Cribier '825 patent by supplying components constituting a material part of the invention claimed in the Cribier '825 patent, knowing the same to be especially made or especially adapted for infringement of the Cribier '825 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, including without limitation infringement by virtue of Medtronic CoreValve LLC's manufacture of the Generation 3 ReValving system.

22.     The foregoing infringement has been willful and deliberate, rendering this case exceptional within the meaning of 35 U.S.C. § 285.

23.     Counterclaim-Plaintiffs Edwards PVT and Edwards LLC have been damaged and will be irreparably injured by the foregoing continuing infringement, for which Edwards PVT and Edwards LLC have no adequate remedy at law. These

Answer and Counterclaims
Case No. SACV11-00961

infringing activities will continue unless enjoined by this Court.

## ADDITIONAL COUNTERCLAIMS

Each and all of the Counterclaim-Plaintiffs reserve the right to assert and pursue additional counterclaims resulting from discovery and the Counterclaim-Plaintiffs' ongoing investigations.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim-Plaintiffs Edwards and Edwards PVT pray for relief as follows:

A.    That the Court enter judgment that Edwards has not infringed the Seguin'281 patent, either literally or under the doctrines of equivalents;

B.    That the Court enter judgment that the Seguin '281 patent is invalid;

C.    That the Court enter judgment that Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc. and Medtronic Vascular, Inc. have infringed, contributorily infringed and/or actively induced the infringement of the Cribier '825 patent;

D.    That the Court enter judgment that the foregoing infringement by Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc. and Medtronic Vascular, Inc. has been willful and deliberate;

E.    That the Court enter an order permanently enjoining and restraining Medtronic CoreValve LLC, Medtronic CV Luxembourg S.a.r.l., Medtronic Vascular Galway Ltd., Medtronic, Inc. and Medtronic Vascular, Inc., their officers, agents, servants, employees and attorneys, all parent, subsidiary and affiliate corporations and other related business entities, and all other persons or entities acting in concert, participation or in privity with one or more of them, and their successors and assigns, from infringing, contributing to the infringement of, or actively inducing others to infringe the Cribier '825 patent;

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

F.      That the Court award Edwards PVT and Edwards LLC damages, in an amount to be determined at trial, together with interest and costs as fixed by the Court;

G.      That the Court award Edwards PVT and Edwards LLC enhanced damages under 35 U.S.C. § 284;

H.      That the Court award Edwards and Edwards PVT their reasonable attorneys' fees and their costs and disbursements in this action, as provided by 35 U.S.C. § 285; and

I.      That the Court grant Edwards and Edwards PVT such other relief as the Court deems just and proper.

## **JURY DEMAND**

Edwards and Edwards PVT demand a trial by jury on all issues so triable in its Counterclaims.

Dated: September 19, 2011              SNELL & WILMER L.L.P
                                       William S. O'Hare
                                       Deborah S. Mallgrave

                                       PAUL WEISS RIFKIND WHARTON &
                                       GARRISON L.L.P.
                                       John E. Nathan (*pro hac vice*)
                                       Catherine Nyarady (*pro hac vice*)
                                       Brian P. Egan (*pro hac vice*)

                                       By:   *s/ Deborah S. Mallgrave*
                                       _____
                                             Deborah S. Mallgrave
                                             Attorneys for Defendants and
                                             Counterclaim-Plaintiffs
                                             Edwards Lifesciences Corporation,
                                             Edwards Lifesciences LLC, and
                                             Edwards Lifesciences (U.S.) Inc.

                                             Attorneys for Counterclaim-Plaintiff
                                             Edwards Lifesciences PVT, Inc.

Snell & Wilmer
— L.L.P —
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Answer and Counterclaims
Case No. SACV11-00961

- 11 -

# Exhibit A

US008002825B2

(12) **United States Patent**
Letac et al.

(10) Patent No.: **US 8,002,825 B2**
(45) Date of Patent: **\*Aug. 23, 2011**

(54) **IMPLANTABLE PROSTHETIC VALVE FOR TREATING AORTIC STENOSIS**

(75) Inventors: **Brice Letac**, Mont-Saint-Aigan (FR); **Alain Cribier**, Pavilly (FR)

(73) Assignee: **Edwards Lifesciences PVT, Inc.**, Irvine, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/915,538**

(22) Filed: **Oct. 29, 2010**

(65) **Prior Publication Data**

US 2011/0040375 A1     Feb. 17, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/942,690, filed on Nov. 19, 2007, now Pat. No. 7,846,204, which is a continuation of application No. 11/110,402, filed on Apr. 20, 2005, now abandoned, which is a continuation of application No. 10/139,741, filed on May 2, 2002, now Pat. No. 6,908,481, which is a continuation of application No. 09/795,803, filed on Feb. 28, 2001, now abandoned, which is a continuation of application No. 09/345,824, filed on Jun. 30, 1999, now abandoned, which is a continuation of application No. PCT/EP97/07337, filed on Dec. 13, 1997.

(30) **Foreign Application Priority Data**

Dec. 31, 1996     (EP) ...................................... 96402920

(51) **Int. Cl.**
*A61F 2/24*     (2006.01)

(52) **U.S. Cl.** ........................ **623/2.14**; 623/2.17; 623/900

(58) **Field of Classification Search** ................. 623/2.14, 623/2.17, 900, 1.26, 2.12
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,409,013 A     11/1968  Berry
(Continued)

FOREIGN PATENT DOCUMENTS

DE     2246526     3/1973
(Continued)

OTHER PUBLICATIONS

Andersen et al., "Transluminal implantation of artificial heart valves. Description of a new expandable aortic valve and initial results with implantation by catheter technique in closed chest pigs." European Heart Journal (1992) 13, pp. 704-708.

(Continued)

*Primary Examiner* — Brian Pellegrino
(74) *Attorney, Agent, or Firm* — David L. Hauser

(57) **ABSTRACT**

A prosthetic valve for implantation in a stenosed aortic valve. The prosthetic valve includes a compressible and expandable frame formed with intersecting metallic bars and a valvular structure made with pericardial tissue. The frame is compressible for delivery into a patient's vasculature through an 18 F (5.7 mm) arterial introducer using a catheterization technique. The bars of the frame preferably have a diameter in the range of 0.1 to 0.6 mm for providing the frame with sufficient radial strength to resist the recoil force exerted by the stenosed aortic valve after implantation. The prosthetic valve includes an internal cover made with pericardial tissue. The internal cover is fastened to an internal surface of the frame between an inlet end of the frame and the valvular structure for preventing regurgitation.

**20 Claims, 18 Drawing Sheets**



**Exhibit A**

## US 8,002,825 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,548,417 | A | 12/1970 | Kisher |
| 3,587,115 | A | 6/1971 | Shiley |
| 3,657,744 | A | 4/1972 | Ersek |
| 3,671,979 | A | 6/1972 | Moulopoulos |
| 3,714,671 | A | 2/1973 | Edwards et al. |
| 3,755,823 | A | 9/1973 | Hancock |
| 4,035,849 | A | 7/1977 | Angell et al. |
| 4,056,854 | A | 11/1977 | Boretos et al. |
| 4,106,129 | A | 8/1978 | Carpentier et al. |
| 4,222,126 | A | 9/1980 | Boretos et al. |
| 4,265,694 | A | 5/1981 | Boretos et al. |
| 4,297,749 | A | 11/1981 | Davis et al. |
| 4,339,831 | A | 7/1982 | Johnson |
| 4,343,048 | A | 8/1982 | Ross et al. |
| 4,345,340 | A | 8/1982 | Rosen |
| 4,373,216 | A | 2/1983 | Klawitter |
| 4,406,022 | A | 9/1983 | Roy |
| 4,470,157 | A | 9/1984 | Love |
| 4,535,483 | A | 8/1985 | Klawitter et al. |
| 4,574,803 | A | 3/1986 | Storz |
| 4,592,340 | A | 6/1986 | Boyles |
| 4,605,407 | A | 8/1986 | Black et al. |
| 4,612,011 | A | 9/1986 | Kautzky |
| 4,629,459 | A | 12/1986 | Ionescu et al. |
| 4,643,732 | A | 2/1987 | Pietsch et al. |
| 4,655,771 | A | 4/1987 | Wallsten |
| 4,687,483 | A | 8/1987 | Fisher et al. |
| 4,692,164 | A | 9/1987 | Dzemeshkevich et al. |
| 4,733,665 | A | 3/1988 | Palmaz |
| 4,759,758 | A | 7/1988 | Gabbay |
| 4,777,951 | A | 10/1988 | Cribier et al. |
| 4,787,899 | A | 11/1988 | Lazarus |
| 4,787,901 | A | 11/1988 | Baykut |
| 4,796,629 | A | 1/1989 | Grayzel |
| 4,829,990 | A | 5/1989 | Thuroff et al. |
| 4,851,001 | A | 7/1989 | Taheri |
| 4,856,516 | A | 8/1989 | Hillstead |
| 4,878,495 | A | 11/1989 | Grayzel |
| 4,878,906 | A | 11/1989 | Lindermann et al. |
| 4,883,458 | A | 11/1989 | Shiber |
| 4,922,905 | A | 5/1990 | Strecker |
| 4,966,604 | A | 10/1990 | Reiss |
| 4,979,939 | A | 12/1990 | Shiber |
| 4,986,830 | A | 1/1991 | Owens et al. |
| 4,994,077 | A | 2/1991 | Dobben |
| 5,007,896 | A | 4/1991 | Shiber |
| 5,026,366 | A | 6/1991 | Leckrone |
| 5,032,128 | A | 7/1991 | Alonso |
| 5,037,434 | A | 8/1991 | Lane |
| 5,047,041 | A | 9/1991 | Sammuels |
| 5,080,668 | A | 1/1992 | Bolz et al. |
| 5,085,635 | A | 2/1992 | Cragg |
| 5,089,015 | A | 2/1992 | Ross |
| 5,152,771 | A | 10/1992 | Sabbaghian et al. |
| 5,163,953 | A | 11/1992 | Vince |
| 5,167,628 | A | 12/1992 | Boyles |
| 5,282,847 | A | 2/1994 | Trescony et al. |
| 5,295,958 | A | 3/1994 | Shturman |
| 5,332,402 | A | 7/1994 | Teitelbaum |
| 5,360,444 | A | 11/1994 | Kusuhara |
| 5,370,685 | A | 12/1994 | Stevens |
| 5,397,351 | A | 3/1995 | Pavcnik et al. |
| 5,411,055 | A | 5/1995 | Anderson et al. |
| 5,411,552 | A | 5/1995 | Anderson et al. |
| 5,443,446 | A | 8/1995 | Shturman |
| 5,480,424 | A | 1/1996 | Cox |
| 5,500,014 | A | 3/1996 | Quijano et al. |
| 5,545,209 | A | 8/1996 | Roberts et al. |
| 5,545,214 | A | 8/1996 | Stevens |
| 5,549,665 | A | 8/1996 | Vesely |
| 5,554,185 | A | 9/1996 | Block et al. |
| 5,571,175 | A | 11/1996 | Vanney et al. |
| 5,591,185 | A | 1/1997 | Kilmer et al. |
| 5,607,464 | A | 3/1997 | Trescony et al. |

| | | | | |
|---|---|---|---|---|
| 5,609,626 | A | 3/1997 | Quijano et al. | |
| 5,716,417 | A | 2/1998 | Girard et al. | |
| 5,728,068 | A | 3/1998 | Leone et al. | |
| 5,749,890 | A | 5/1998 | Shaknovich | |
| 5,756,476 | A | 5/1998 | Epstein | |
| 5,824,037 | A | 10/1998 | Fogarty et al. | |
| 5,840,081 | A | 11/1998 | Andersen et al. | |
| 5,855,597 | A | 1/1999 | Jayaraman | |
| 5,855,601 | A | 1/1999 | Bessler | |
| 5,855,602 | A | 1/1999 | Angell | |
| 6,168,614 | B1 | 1/2001 | Andersen et al. | |
| 6,582,462 | B1 | 6/2003 | Andersen et al. | |
| 6,908,481 | B2 | 6/2005 | Cribier | |
| 7,585,321 | B2 | 9/2009 | Cribier | |
| 7,618,446 | B2 | 11/2009 | Andersen et al. | |
| 7,789,909 | B2 | 9/2010 | Andersen et al. | |
| 7,846,204 | B2 * | 12/2010 | Letac et al. | .................. 623/2.15 |
| 2001/0007956 | A1 | 7/2001 | Letac et al. | |
| 2001/0010017 | A1 | 7/2001 | Letac et al. | |
| 2003/0109924 | A1 | 6/2003 | Cribier | |
| 2005/0203616 | A1 | 9/2005 | Cribier | |
| 2008/0009940 | A1 | 1/2008 | Cribier | |
| 2008/0077236 | A1 | 3/2008 | Letac et al. | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19532846 | 3/1997 |
| DE | 19546692 | 6/1997 |
| EP | 0103546 | 3/1984 |
| EP | 0144167 | 6/1985 |
| EP | 0592410 | 11/1991 |
| GB | 1268484 | 3/1972 |
| GB | 2056023 | 3/1981 |
| SU | 158988 | 5/1964 |
| SU | 1271508 | 11/1986 |
| SU | 1371700 | 2/1988 |
| WO | WO 91/17720 | 11/1991 |
| WO | WO 92/17118 | 10/1992 |
| WO | WO 93/01768 | 2/1993 |
| WO | WO 94/12136 | 6/1994 |
| WO | WO 96/40008 | 12/1996 |
| WO | WO 98/29057 | 7/1998 |
| WO | WO 99/33414 | 7/1999 |
| WO | WO 99/40964 | 8/1999 |
| WO | WO 99/47075 | 9/1999 |
| WO | WO 00/41652 | 7/2000 |
| WO | WO 00/47139 | 8/2000 |

### OTHER PUBLICATIONS

Bailey, Steven R., "Percutaneous Expandable Prosthetic Valves", Textbook of Interventional Cardiology, 1994, vol. 2, Second Edition, W.B. Saunders Company, Philadelphia, PA, 11 Sheets.

Hourihan, et al., "Transcatheter Umbrella Closure of Valvular and Paravalvular Leaks," Journal of the American College of Cardiology, vol. 20, No. 6, pp. 1371 and 1374-1377, (1992).

Sugie, Waburo, M.D., et al., "Clinical Experience With Supported Homograft Heart Valve for Mitral and Aortic Valve Replacement," The Journal of Thoracic and Cardiovascular Surgery, vol. 57, No. 4, pp. 455-563, Apr. 1969.

Amendments to claims 33-49 from U.S. Appl. No. 09/795,803, filed Apr. 15, 2002 (pp. 1-3 ).

Claims 1-32 form U.S. Appl. No. 09/345,824, filed Jun. 30, 1999, (pp. 39-43).

Claims 33-49 from U.S. Appl. No. 09/795,803, filed Sep. 5, 2001, in response to Office Action of Jun. 5, 2001. (5 sheets ).

Extended European Search Report dated Nov. 25, 2009 from corresponding EP Case No. EP08016624.2.

Office Action from U.S. Appl. No. 09/795,803 mailed Sep. 25, 2002. (7 sheets).

Office Action from U.S. Appl. No. 09/345,824 mailed Aug. 29, 2000 ( pp. 2-8).

* cited by examiner



FIG_1a

FIG_1b

FIG_1c

Exhibit A



FIG_2a



FIG_2b



FIG_3a



FIG_3b

Exhibit A



FIG_4a



FIG_4b



FIG_5a



FIG_5b

Exhibit A



FIG_7



FIG_6a



FIG_6b



FIG_6d



FIG_6c

Exhibit A



FIG_8a



FIG_8b

**Exhibit A**



FIG_9a



FIG_9b



**FIG_10a**



**FIG_10b**

**Exhibit A**



FIG_11a

FIG_11b

FIG_11c

FIG_11d

FIG_11e

Case 8:11-cv-00961-JVS-MLG  Document 27  Filed 09/19/11  Page 25 of 45  Page ID #:174



FIG_12b



FIG_12a

Exhibit A



FIG. 13f

FIG. 13e

FIG. 13d

Exhibit A



**Exhibit A**



FIG. 13l

FIG. 13k

FIG. 13j

Exhibit A

# FIG_14



**Exhibit A**

Case 8:11-cv-00961-JVS-MLG Document 27 Filed 09/19/11 Page 31 of 45 Page ID #:180



FIG.15c

FIG.15b

FIG.15a

**Exhibit A**



FIG. 15f

FIG. 15e

FIG. 15d

Exhibit A

US 8,002,825 B2

**1**

## IMPLANTABLE PROSTHETIC VALVE FOR TREATING AORTIC STENOSIS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/942,690, filed Nov. 19, 2007, now U.S. Pat. No. 7,846,204, which is a continuation of U.S. patent application Ser. No. 11/110,402, filed Apr. 20, 2005, now abandoned, which is a continuation of U.S. patent application Ser. No. 10/139,741, filed May 2, 2002, now U.S. Pat. No. 6,908, 481, which is a continuation of U.S. patent application Ser. No. 09/795,803, filed Feb. 28, 2001, now abandoned, which in turn is a continuation of U.S. patent application Ser. No. 09/345,824, filed Jun. 30, 1999, now abandoned, which is a continuation of International application No. PCT/EP 97/07337, filed Dec. 31, 1997, which designates the United States and was published in English by the International Bureau on Jul. 9, 1998 as WO 98/29057, which claims priority to European application No. 96402929.2, filed Dec. 31, 1996, all of which are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

The present invention relates to a valve prosthesis for implantation in body channels, more particularly but not only to, cardiac valve prosthesis to be implanted by a transcutaneous catheterization technique.

The valve prosthesis can be also applied to other body channels provided with native valves, such as veins or in organs (liver, intestine, urethra . . . ).

The present invention also relates to a method for implanting a valve prosthesis, such as the valve according to the present invention.

Implantable valves, which will be indifferently designated hereafter as "IV", "valve prosthesis" or "prosthetic valve", permits the reparation of a valvular defect by a less invasive technique in place of the usual surgical valve implantation which, in the case of valvular heart diseases, requires thoracotomy and extracorporeal circulation. A particular use for the IV concerns patients who cannot be operated on because of an associated disease or because of very old age or also patients who could be operated on but only at a very high risk.

Although the IV of the present invention and the process for implanting said IV can be used in various heart valve diseases, the following description will first concern the aortic orifice in aortic stenosis, more particularly in its degenerative form in elderly patients.

Aortic stenosis is a disease of the aortic valve in the left ventricle of the heart. The aortic valvular orifice is normally capable of opening during systole up to 4 to 6 cm², therefore allowing free ejection of the ventricular blood volume into the aorta. This aortic valvular orifice can become tightly stenosed, and therefore the blood cannot anymore be freely ejected from the left ventricle. In fact, only a reduced amount of blood can be ejected by the left ventricle which has to markedly increase the intra-cavitary pressure to force the stenosed aortic orifice. In such aortic diseases, the patients can have syncope, chest pain, and mainly difficulty in breathing. The evolution of such a disease is disastrous when symptoms of cardiac failure appear, since 50% of the patients die in the year following the first symptoms of the disease.

The only commonly available treatment is the replacement of the stenosed aortic valve by a prosthetic valve via surgery: this treatment moreover providing excellent results. If surgery is impossible to perform, i.e., if the patient is deemed

**2**

inoperable or operable only at a too high surgical risk, an alternative possibility is to dilate the valve with a balloon catheter to enlarge the aortic orifice. Unfortunately, a good result is obtained only in about half of the cases and there is a high restenosis rate, i.e., about 80% after one year.

Aortic stenosis is a very common disease in people above seventy years old and occurs more and more frequently as the subject gets older. As evidenced, the present tendency of the general evolution of the population is becoming older and older. Also, it can be evaluated, as a crude estimation, that about 30 to 50% of the subjects who are older than 80 years and have a tight aortic stenosis, either cannot be operated on for aortic valve replacement with a reasonable surgical risk or even cannot be considered at all for surgery.

It can be estimated that, about 30 to 40 persons out of a million per year, could benefit from an implantable aortic valve positioned by a catheterization technique. Until now, the implantation of a valve prosthesis for the treatment of aortic stenosis is considered unrealistic to perform since it is deemed difficult to superpose another valve such an implantable valve on the distorted stenosed native valve without excising the latter.

From 1985, the technique of aortic valvuloplasty with a balloon catheter has been introduced for the treatment of subjects in whom surgery cannot be performed at all or which could be performed only with a prohibitive surgical risk. Despite the considerable deformation of the stenosed aortic valve, commonly with marked calcification, it is often possible to enlarge significantly the aortic orifice by balloon inflation, a procedure which is considered as low risk.

However, this technique has been abandoned by most physicians because of the very high restenosis rate which occurs in about 80% of the patients within 10 to 12 months. Indeed, immediately after deflation of the balloon, a strong recoil phenomenon often produces a loss of half or even two thirds of the opening area obtained by the inflated balloon. For instance, inflation of a 20 mm diameter balloon in a stenosed aortic orifice of 0.5 cm² area gives, when forcefully and fully inflated, an opening area equal to the cross sectional area of the maximally inflated balloon, i.e., about 3 cm². However, measurements performed a few minutes after deflation and removal of the balloon have only an area around 1 cm² to 1.2 cm². This is due to the considerable recoil of the fibrous tissue of the diseased valve. The drawback in this procedure has also been clearly shown on fresh post mortem specimens.

However, it is important to note that whereas the natural normal aortic valve is able to open with an orifice of about 5 to 6 cm² and to accommodate a blood flow of more that 15 l/min during heavy exercise for instance, an opening area of about 1.5 to 2 cm² can accept a 6 to 8 l/min blood flow without a significant pressure gradient. Such a flow corresponds to the cardiac output of the elderly subject with limited physical activity.

Therefore, an IV would not have to produce a large opening of the aortic orifice since an opening about 2 cm² would be sufficient in most subjects, in particular in elderly subjects, whose cardiac output probably does not reach more than 6 to 8 l/min during normal physical activity. For instance, the surgically implanted mechanical valves have an opening area which is far from the natural valve opening that ranges from 2 to 2.5 cm², mainly because of the room taken by the large circular structure supporting the valvular part of the device.

The prior art describes examples of cardiac valves prosthesis that are aimed at being implanted without surgical intervention by way of catheterization. For instance, U.S. Pat. No. 5,411,552 describes a collapsible valve able to be introduced

**Exhibit A**

US 8,002,825 B2

**3**

in the body in a compressed presentation and expanded in the right position by balloon inflation.

Such valves, with a semi-lunar leaflet design, tend to imitate the natural valve. However, this type of design is inherently fragile, and such structures are not strong enough to be used in the case of aortic stenosis because of the strong recoil that will distort this weak structure and because they would not be able to resist the balloon inflation performed to position the implantable valve. Furthermore, this valvular structure is attached to a metallic frame of thin wires that will not be able to be tightly secured against the valve annulus. The metallic frame of this implantable valve is made of thin wires like in stents, which are implanted in vessels after balloon dilatation. Such a light stent structure is too weak to allow the implantable valve to be forcefully embedded into the aortic annulus. Moreover, there is a high risk of massive regurgitation (during the diastolic phase) through the spaces between the frame wires which is another prohibitive risk that would make this implantable valve impossible to use in clinical practice.

Furthermore, an important point in view of the development of the IV is that it is possible to maximally inflate a balloon placed inside the compressed implantable valve to expand it and insert it in the stenosed aortic valve up to about 20 to 23 mm in diameter. At the time of maximum balloon inflation, the balloon is absolutely stiff and cylindrical without any waist. At that moment, the implantable valve is squeezed and crushed between the strong aortic annulus and the rigid balloon with the risk of causing irreversible damage to the valvular structure of the implantable valve.

SUMMARY OF THE INVENTION

The invention is aimed to overcome these drawbacks and to implant an IV which will remain reliable for years.

A particular aim of the present invention is to provide an IV, especially aimed at being used in case of aortic stenosis, which structure is capable of resisting the powerful recoil force and to stand the forceful balloon inflation performed to deploy the IV and to embed it in the aortic annulus.

Another aim of the present invention is to provide an efficient prosthesis valve which can be implanted by a catheterization technique, in particular in a stenosed aortic orifice, taking advantage of the strong structure made of the distorted stenosed valve and of the large opening area produced by preliminary balloon inflation, performed as an initial step of the procedure.

A further aim of the present invention is to provide an implantable valve which would not produce any risk of fluid regurgitation.

A further aim of the present invention is to provide a valve prosthesis implantation technique using a two-balloon catheter and a two-frame device.

These aims are achieved according to the present invention which provides a valve prosthesis of the type mentioned in the introductory part and wherein said valve prosthesis comprises a collapsible continuous structure with guiding means providing stiffness and a frame to which said structure is fastened, said frame being strong enough to resist the recoil phenomenon of the fibrous tissue of the diseased valve.

The IV, which is strongly embedded, enables the implantable valve to be maintained in the right position without any risk of further displacement, which would be a catastrophic event.

More precisely, this valvular structure comprises a valvular tissue compatible with the human body and blood, which is supple and resistant to allow said valvular structure to pass from a closed state to an open state to allow a body fluid, more

**4**

particularly the blood, exerting pressure on said valvular structure, to flow. The valvular tissue forms a continuous surface and is provided with guiding means formed or incorporated within, creating stiffened zones which induce the valvular structure to follow a patterned movement from its open position to its closed state and vice-versa, providing therefore a structure sufficiently rigid to prevent diversion, in particular into the left ventricle and thus preventing any regurgitation of blood into the left ventricle in case of aortic implantation.

Moreover, the guided structure of the IV of the invention allows the tissue of this structure to open and close with the same patterned movement while occupying as little space as possible in the closed state of the valve. Therefore, owing to these guiding means, the valvular structure withstands the unceasing movements under blood pressure changes during the heart beats.

More preferably, the valvular structure has a substantially truncated hyperboloidal shape in its expanded position, with a larger base and a growing closer neck, ending in a smaller extremity forming the upper part of the valvular structure. The valvular structure has a curvature at its surface that is concave towards the aortic wall. Such a shape produces a strong and efficient structure in view of the systolo-diastolic movement of the valvular tissue. Such a valvular structure with its simple and regular shape also lowers the risk of being damaged by forceful balloon inflation at the time of IV deployment.

A trunco-hyperboloidal shape with a small diameter at the upper extremity facilitates the closure of the valve at the beginning of diastole in initiating the starting of the reverse movement of the valvular tissue towards its base. Another advantage of this truncated hyperboloidal shape is that the upper extremity of the valvular structure, because of its smaller diameter, remains at a distance from the coronary ostia during systole as well as during diastole, thus offering an additional security to ensure not to impede at all the passage of blood from the aorta to the coronary ostia.

As another advantageous embodiment of the invention, the guiding means of the valvular structure are inclined strips from the base to the upper extremity of the valvular structure with regard to the central axis of the valvular structure. This inclination initiates and imparts a general helicoidal movement of the valvular structure around said central axis at the time of closure or opening of said structure, such a movement enabling to help initiate and finalize the closure of the valvular structure. In particular, this movement improves the collapse of the valvular structure towards its base at the time of diastole and during the reversal of flow at the very beginning of diastole. During diastole, the valvular structure thus fails down, folding on itself and collapses on its base, therefore closing the aortic orifice. The strips can be pleats, strengthening struts or thickened zones.

In other embodiments, said guiding means are rectilinear strips from the base to the upper extremity of the valvular structure. In this case, the guiding means can comprise pleats, struts or thickened zones. In a particular embodiment, the stiffened zones then created can be advantageously two main portions, trapezoidal in shape, formed symmetrically one to each other with regard to the central axis of the valvular structure, and two less rigid portions separating said two main portions to lead to a tight closeness in shape of a closed slot at the time of closure of the upper extremities of the main portions of the valvular structure. The thickened zones can be extended up to form the stiffened zones.

More particularly, each of said main slightly rigid portions occupy approximately one third of the circumference of the

**Exhibit A**

US 8,002,825 B2

5
6

valvular structure when this valve is in its open position. The slightly rigid portions maintain the valvular structure closed during diastole by firmly applying themselves on each other. The closure of the valvular structure at the time of diastole thus does not have any tendency to collapse too much towards the aortic annulus.

Preferably, the guiding means are a number of pleats formed within the tissue by folding, or formed by recesses or grooves made in the tissue. The shape of the pleats is adapted to achieve a global shape of the desired type for said position.

Alternatively, the guiding means are made of strengthening struts, preferably at least three, incorporated in the tissue in combination or not with said pleats.

The guiding means and, in particular, the strengthening struts, help to prevent the valvular tissue from collapsing back too much and to reverse inside the left ventricle through the base of the frame, preventing the risk of blood regurgitation.

In a preferred prosthetic valve of the invention, said valvular tissue is made of synthetic biocompatible material such as TEFLON® or DACRON®, polyethylene, polyamide, or made of biological material such as pericardium, porcine leaflets and the like. These materials are commonly used in cardiac surgery and are quite resistant, particularly to folding movements due to the increasing systolo-diastolic movements of the valvular tissue and particularly at the junction with the frame of the implantable valve.

The valvular structure is fastened along a substantial portion of an expandable frame, by sewing, by molding or by gluing to exhibit a tightness sufficiently hermetical to prevent any regurgitation of said body fluid between the frame and the valvular structure.

Preferably, an internal cover is coupled or is integral to the valvular structure and placed between said valvular structure and the internal wall of the frame to prevent any passage of the body fluid through said frame. Therefore, there is no regurgitation of blood as it would be the case if there were any space between the valvular structure fastened on the frame and the zone of application of the frame on the aortic annulus. The internal cover makes a sort of "sleeve" at least below the fastening of the valvular structure covering the internal surface of the frame and thus prevents any regurgitation of blood through the frame.

In the present invention, the frame is a substantially cylindrical structure capable of maintaining said body channel open in its expanded state and supporting said collapsible valvular structure.

In a preferred embodiment of the invention, the frame is made of a material which is distinguishable from biological tissue to be easily visible by non invasive imaging techniques.

Preferably, said frame is a stainless metal structure or a foldable plastic material, made of intercrossing, preferably with rounded and smooth linear bars. This frame is strong enough to resist the recoil phenomenon of the fibrous tissue of the diseased valve. The size of the bars and their number are determined to give both the maximal rigidity when said frame is expanded and the smallest volume when the frame is compressed.

More preferably, the frame has projecting curved extremities and presents a concave shape. This is aimed at reinforcing the embedding and the locking of the implantable valve in the distorted aortic orifice.

In a preferred embodiment of the present invention, the IV is made in two parts, a first reinforced frame coupled with a second frame which is made of thinner bars than said first frame and which is embedded inside the second frame. This second frame to which the valvular structure is fastened as described above, is preferably less bulky than the first frame

to occupy as little space as possible and to be easily expanded using low pressure balloon inflation.

The present invention also relates to a double balloon catheter to separately position the first frame in the dilated stenosed aortic valve and place the second frame that comprises the valvular structure. This catheter comprises two balloons fixed on a catheter shaft and separated by few centimeters.

The first balloon is of the type sufficiently strong to avoid bursting even at a very high pressure inflation and is aimed at carrying, in its deflated state, a strong frame aimed at scaffolding the previously dilated stenosed aortic valve. The second balloon is aimed at carrying the second frame with the valvular structure.

An advantage of this double balloon catheter is that each balloon has an external diameter which is smaller than known balloons since each element to which is expanded is smaller.

Moreover, such a double balloon catheter allows to enlarge the choice for making an efficient valvular structure enabling to overcome the following two contradictory conditions:

1) having a soft and mobile valvular structure capable of opening and closing freely in the blood stream, without risk of being damaged by balloon inflation; and
2) needing a very strong structure able to resist the recoil force of the stenosed valve and capable of resisting, without any damage, a strong pressure inflation of the expanding balloon.

Furthermore, the shaft of said double balloon catheter comprises two lumens for successive and separate inflation of each balloon. Of note, an additional lumen capable of allowing a rapid inflation takes additional room in the shaft.

The invention also relates to a method of using a two-balloon catheter with a first frame and second frame to which a valve prosthesis of the type previously described is fastened.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will now be explained and other advantages and features will appear with reference to the accompanying schematical drawings wherein:

FIGS. 1*a*, 1*b* and 1*c* illustrate, in section views, respectively, the normal aortic valve in systole, in diastole and a stenosed aortic valve;

FIGS. 2*a* and 2*b* illustrate two examples of a metallic frame which are combined to a valvular structure according to the present invention;

FIGS. 3*a* and 3*b* illustrate a frame according to the invention in its expanded position with an opening out of the extremities, respectively, with a cylindrical and a concave shape;

FIGS. 4*a* and 4*b* illustrate an IV of the invention respectively in its compressed position and in its expanded position in an open position as in systole;

FIGS. 5*a* and 5*b* illustrate respectively an IV of the invention in its closed position and a sectional view according to the central axis of such a valvular structure which is closed as in diastole;

FIGS. 6*a* to 6*d* illustrate a sectional view according to the central axis of an IV according to the present invention and showing the internal cover and the external cover of the valvular structure overlapping partially or non overlapping the frame bars;

FIG. 7 illustrates the frontal zig-zag fastening line of the valvular tissue on the frame;

FIGS. 8*a* and 8*b* illustrate, respectively, a perspective view of a valvular structure and an internal cover made all of one

US 8,002,825 B2

7                                                                                      8

piece and a perspective view of the corresponding frame into which they will be inserted and fastened;

FIGS. 9a and 9b illustrate inclined strengthening struts, an example of a valvular structure according to the invention, respectively in the open position and in the closed position;

FIGS. 10a and 10b illustrate an example of a valvular structure comprising pleats, respectively in the open and in the closed position;

FIGS. 11a and 11b illustrate a valvular structure comprising two trapezoidal slightly rigid portions, respectively in the open and in the closed position;

FIGS. 11c to 11e illustrate a valvular structure comprising a rectangular stiffened zone, respectively in the open, intermediate and closed position;

FIGS. 12a and 12b illustrate, respectively, a perspective and cross sectional views of an implantable valve in its compressed presentation squeezed on a balloon catheter;

FIGS. 13a to 13l illustrate views of the successive procedure steps for the IV implantation in a stenosed aortic orifice;

FIG. 14 illustrates an implantable valve made in two parts in its compressed presentation squeezed on a two-balloon catheter with a reinforced frame on a first balloon and with the implantable valve on the second balloon; and

FIGS. 15a to 15f illustrate the successive steps of the implantation of the implantation valve in two parts with a two-balloon catheter.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the diastole and systole illustrations of section views of FIGS. 1a and 1b, the arrows A indicates the general direction of the blood flow. The semi-lunar leaflets 1 and 2 of a native aortic valve (with only two out of three shown here) are thin, supple and move easily from the completely open position (systole) to the closed position (diastole). The leaflets originate from an aortic annulus 2a.

The leaflets 1' and 2' of a stenosed valve as illustrated in FIG. 1c, are thickened, distorted, calcified and more or less fused, leaving only a small hole or a narrow slit 3, which makes the ejection of blood from the left ventricle cavity 4 into the aorta 5 difficult and limited. FIGS. 1a to 1c show also the coronary artery ostium 6a and 6b and FIG. 1a shows, in particular, the mitral valve 7 of the left ventricle cavity 4.

An implantable valve according to the invention essentially comprises a supple valvular structure supported by a strong frame. The positioning of the implantable valve is an important point since the expanded frame has to be positioned exactly at the level of the native valvular leaflets 1, 2 of the native valve, the structures of which are pushed aside by the inflated balloon.

Ideally, the implantable valve is positioned with the fastening line of the valvular structure on the frame exactly on the remains of the crushed stenosed valve to prevent any regurgitation of blood. In practice, it is difficult to position the implantable valve within less than 2 or 3 mm. However, any risk of regurgitation of blood is eliminated with the presence of an internal cover, as will be described below.

The upper limit of the frame should be placed below the opening of the coronary arteries, i.e., the coronary ostia 6, or at their level so that the frame does not impede free blood flow in the coronary arteries. This point is a delicate part of positioning an IV since the distance between the superior limit of the leaflets of the natural valve and the coronary ostia 6 is only about 5 to 6 mm. However, the ostia are located in the Valsalva

sinus 8 which constitutes a hollow that are located a little out of the way. This helps to prevent from impeding the coronary blood flow by the IV.

At the time of implantation, the operator evaluates the exact positioning of the coronary ostia by looking at the image produced by a sub-valvular angiogram with contrast injection performed before the implantation procedure. This image will be fixed in the same projection on a satellite TV screen and will permit the evaluation of the level of the origin of the right and left coronary arteries. Possibly, in case the ostia are not clearly seen by sub-valvular angiography, a thin guide wire, as those used in coronary angioplasty, is positioned in each of the coronary arteries to serve as a marker of the coronary ostia.

The lower part of the frame of the IV preferably extends by 2 or 3 mm inside the left ventricle 4, below the aortic annulus 2a. However, this part of the frame should not reach the insertion of the septal leaflet of the mitral valve 7, so that it does not interfere with its movements, particularly during diastole.

FIGS. 2a and 2b show respectively an example of a cylindrical frame or stent 10 comprising intercrossing linear bars 11, with two intersections I by bar 11, the bars 11 being soldered or provided from a folded wire to constitute the frame, with for instance a 20 mm, 15 mm or 12 mm height, and an example with only one intersection of bars 11. Preferably, such a frame is expandable from a size of about 4 to 5 millimeters to a size of about 20 to 25 mm in diameter, or even to about 30-35 mm (or more) in particular cases, for instance for the mitral valve. Moreover, said frame, in its fully expanded state, has a height of approximately between 10 and 15 mm and in its fully compressed frame, a height of approximately 20 mm. The number and the size of the bars are adapted to be sufficiently strong and rigid when the frame is fully open in the aortic orifice to resist the strong recoil force exerted by the distorted stenosed aortic orifice after deflation' of the balloon used in the catheterization technique which has been previously maximally inflated to enlarge the stenosed valve orifice.

The frame may have several configurations according to the number of bars 11 and intersections. This number, as well as the size and the strength of the bars 11, are calculated taking into account all the requirements described, i.e., a small size in its compressed form, its capacity to be enlarged up to at least 20 mm in diameter and being strong when positioned in the aortic orifice to be able to be forcefully embedded in the remains of the diseased aortic valve and to resist the recoil force of the aortic annulus. The diameter of the bars is chosen, for instance, in the range of 0.1-0.6 mm.

A frame particularly advantageous presents, when deployed in its expanded state, an opening out 12 at both extremities as shown in FIGS. 3a and 3b, the frame having a linear profile (FIG. 3a) or a concave shape profile (FIG. 3b). This is aimed at reinforcing the embedding of the IV in the aortic orifice. However, the free extremities of the openings 12 are rounded and very smooth to avoid any traumatism of the aorta or of the myocardium.

The structure of a preferred frame used in the present invention both maintains the aortic orifice fully open once dilated and produces a support for the valvular structure. The frame is also foldable. When folded by compression, the diameter of said frame is about 4 to 5 millimeters, in view of its transcutaneous introduction in the femoral artery through an arterial sheath of 14 to 16 F (F means French, a unit usually used in cardiology field) i.e., about 4.5 to 5.1 mm. Also, as described below, when positioned in the aortic orifice, the

**Exhibit A**

US 8,002,825 B2

9      10

frame is able to expand under the force of an inflated balloon up to a size of 20 to 23 mm in diameter.

The frame is preferably a metallic frame, preferably made of steel. It constitutes a frame with a grate type design able to support the valvular structure and to behave as a strong scaffold for the open stenosed aortic orifice.

When the frame is fully expanded, its intercrossing bars push against the remains of the native stenosed valve that has been crushed aside against the aortic annulus by the inflated balloon. This produces a penetration and embeds the bars within the remains of the stenosed valve, in particular owing to a concave profile of the frame provided with an opening out, as illustrated in FIG. 3b. This embedding of the frame on the aortic annulus, or more precisely on the remains of the crushed distorted aortic valve, will be determinant for the strong fixation of the IV in the right position, without any risk of displacement.

Moreover, the fact that the valve leaflets in degenerative aortic stenosis are grossly distorted and calcified, sometimes leaving only a small hole or a small slit in the middle of the orifice, has to be considered an advantage for the implantation of the valve and for its stable positioning without risk of later mobilization. The fibrous and calcified structure of the distorted valve provides a strong base for the frame of the IV and the powerful recoil phenomenon that results from elasticity of the tissues contribute to the fixation of the metallic frame.

The height of the fully expanded frame of the illustrated frames 10 is preferably between 10 and 15 mm. Indeed, since the passage from the compressed state to the expanded state results in a shortening of the metallic structure, the structure in its compressed form is a little longer, i.e., preferably about 20 mm length. This does not constitute a drawback for its transcutaneous introduction and its positioning in the aortic orifice.

As mentioned above, the frame is strong enough to be able to oppose the powerful recoil force of the distended valve and of the aortic annulus 2a. Preferably it does not possess any flexible properties. When the frame has reached its maximal expanded shape under the push of a forcefully inflated balloon, it remains substantially without any decrease in size and without any change of shape. The size of the bars that are the basic elements of the frame is calculated in such a way to provide a substantial rigidity when the frame is fully expanded. The size of the bars and their number are calculated to give both maximal rigidity when expanded and the smallest volume when the metallic frame is its compressed position.

At the time of making the IV, the frame is expanded by dilatation to its broadest dimension, i.e., between 20 mm and 25 mm in diameter, so as to be able to fasten the valvular structure on the inside side of its surface. This fastening is performed using the techniques in current use for the making of products such as other prosthetic heart valves or multipolars catheters etc. Afterwards, it is compressed in its minimal size, i.e., 4 or 5 mm, in diameter in view of its introduction in the femoral artery. At time of the IV positioning, the frame is expanded again by balloon inflation to its maximal size in the aortic orifice.

If the frame is built in an expanded position, it will be compressed, after fastening the valvular structure, by exerting a circular force on its periphery and/or on its total height until obtaining the smallest compressed position. If the frame is built in its compressed position, it will be first dilated, for instance, by inflation of a balloon and then compressed again as described above.

To help localizing the IV, the frame being the only visible component of the valve, the shaft of the balloon catheter on which will be mounted the IV before introduction in the body

(see below) possesses preferentially metallic reference marks easily seen on fluoroscopy. One mark will be at level of the upper border of the frame and the other at the level of the lower border. The IV, when mounted on the catheter shaft and crimpled on it, is exactly positioned taking into account these reference marks on the shaft.

Accordingly, the frame is visible during fluoroscopy when introduced in the patient's body. When the frame is positioned at the level of the aortic annulus, the upper border of the frame is placed below the coronary ostia. Furthermore, the implanting process during which the balloon inflation completely obstructs the aortic orifice, as seen below, is performed within a very short time, i.e., around 10 to 15 seconds. This also explains why the frame is clearly and easily seen, without spending time to localize it. More particularly, its upper and lower borders are clearly delineated.

FIGS. 4a and 4b show an example of a preferred IV 13 of the present invention, respectively in its compressed position, in view of its introduction and positioning in the aortic orifice, and in its expanded and opened (systole) position. FIGS. 5a and 5b show the expanded position of this example closed in diastole, respectively in perspective and in a crossed section view along the central axis XX of the valve prosthesis.

The valvular structure 14 is compressed inside the frame 10 when this is in its compressed position (FIG. 4a), i.e., it fits into a 4 to 5 mm diameter space. On the other hand, the valvular structure can expand (FIG. 4b) and follow the frame expansion produced by the inflated balloon. It will have to be able to reach the size of the inside of the fully deployed frame.

The illustrated IV 13 is made of a combination of two main parts:

1) the expandable but substantially rigid structure made of the frame 10, a metallic frame in the example; and

2) a soft and mobile tissue constituting the valvular structure 14 exhibiting a continuous surface truncated between a base 15 and an upper extremity 16; the tissue is fastened to the bars 11 of the frame at its base 16 and is able to open in systole and to close in diastole at its extremity 16, as the blood flows in a pulsatile way from the left ventricle towards the aorta.

The tissue has rectilinear struts 17 incorporated in it in plane including the central axis XX, in order to strengthen it, in particular, in its closed state with a minimal occupation of the space, and to induce a patterned movement between its open and closed state. Other examples of strengthening struts are described below. They are formed from thicker zones of the tissue or from strips of stiffening material incorporated in the tissue; they can also be glued or soldered on the valvular tissue.

These strengthening struts help to prevent the valvular tissue from collapsing back too much and to evert inside the left ventricle through the base of the frame. These reinforcements of the valvular tissue help maintain the folded tissue above the level of the orifice during diastole, prevent too much folding back and risk of inversion of the valvular structure inside the left ventricle. By also preventing too much folding, a decrease of the risk of thrombi formation can also be expected by reducing the number of folds.

The truncated shape forming a continuous surface enables to obtain a strong structure and is more efficient for the systolo-diastolic movements of the valvular tissue during heart beats. The truncoidal shape facilitates the closure of the valve structure at the beginning of diastole in facilitating the start of the reverse movement of the valvular tissue towards its base at the time of diastole, i.e., at the time of flow reversal at the very beginning of diastole. During diastole, the valvular structure 14 thus fails down, folding on itself, thereby col-

     **Exhibit A**

US 8,002,825 B2

11                                                                    12

lapsing on its base, and therefore closing the aortic orifice. In fact, the valvular structure has preferably, as illustrated, an hyperboloid shape, with a curvature on its surface concave towards the aortic wall that will contribute to initiating its closure.

Moreover, the basis of the truncated hyperboloid is fixed on the lower part of a frame and the smallest extremity of the truncated hyperboloid is free in the blood stream, during the respected closing and opening phases.

An important advantage of this hyperboloidal shape is that the upper extremity **16** of the valvular structure **14** can remain at a distance from the coronary ostia during systole as well as during diastole, because of its smaller diameter, thus offering an additional security to make certain that the passage of blood from aorta to the coronary ostia is not impeded.

The base **15** of the truncated tissue is attached on the frame **10** along a line of coupling **18** disposed between the inferior fourth and the third fourth of the frame in the example. The upper extremity **16**, with the smaller diameter, overpasses the upper part of the frame by a few millimeters; 6 to 8 mm, for instance. This gives the valvular structure a total height of about 12 to 15 mm.

The upper extremity **16** of the truncated tissue, i.e., the smaller diameter of the hyperboloidal structure **14**, is about 17 to 18 mm in diameter (producing a 2.3 to 2.5 cm$^2$ area opening) for a 20 mm diameter base of the truncated structure, or 19 to 20 mm in diameter (producing a 2.8 or a 3 cm$^2$ area opening) for a 23 mm diameter base. An opening area around 2 cm$^2$ or slightly above, gives satisfactory results, particularly in elderly patients who would not reasonably need to exert high cardiac output.

For instance, in the present example, the line of fastening of the base of the truncated tissue on the frame will have to expand from a 12.5 mm perimeter (for a 4 mm external diameter of the compressed IV) to a 63 mm perimeter (for a 20 mm external diameter of the expanded IV), or to a 72 mm perimeter (for a 23 mm external diameter, in case a 23 mm balloon is used).

Another advantage of this truncated continuous shape is that it is stronger and has less risk of being destroyed or distorted by the forceful balloon inflation at the time of IV deployment. Also, if the truncated hyperboloidal shape is marked, for instance, with a 16 or 17 mm diameter of the upper extremity as compared to a 20 mm diameter of the base (or 18 to 20 mm for 23 mm), the smaller upper part is compliant during balloon inflation in order to enable the balloon to expand cylindrically to its maximal mm diameter (or 23 mm). This is made possible by using a material with some elastic or compliant properties.

The valvular structure of the invention, as shown in the illustrated example, includes advantageously a third part, i.e., the internal cover **19** to be fixed on the internal wall of the frame **10**. This internal cover prevents any passage of blood through the spaces between the bars **11** of the frame in case the implantable valve would be positioned with the fastening line of the valvular structure on the frame not exactly on the remains of the dilated aortic valve, i.e., either above or below. It also strengthens the fastening of the valvular structure **14** to the frame **10**.

In the different sectional views of the different examples of IV according to the invention, as illustrated at FIGS. **6***a* to **6***c*, the internal cover **19** covers the totality of the internal side of the frame **10** (FIG. **6***a*), only the lower part of the frame **10** (FIG. **6***b*), or it can additionally cover partially 3 to 5 mm as shown in the passage of blood from aorta to the coronary ostia FIG. **6***c*, the upper part defined above of the coupling line **18** of the valvular structure.

For instance, such an extension of the internal cover **19** above the fastening line **18** of the valvular structure will give another security to avoid any risk of regurgitation through the spaces between the bars **11** in case the IV would be positioned too low with respect to the border of the native aortic valve.

The internal cover can also be molded to the valvular structure or casted to it which therefore constitutes an integral structure. The valvular structure and the internal cover are therefore strongly locked together with minimum risk of detachment of the valvular structure which is unceasingly in motion during systole and diastole. In that case, only the internal cover has to be fastened on the internal surface of the frame which renders the making of the IV easier and makes the complete device stronger and more resistant. In particular, the junction of the mobile part of the valvular structure and the fixed part being molded as one piece is stronger and capable to face the increasing movements during the systolo-diastolic displacements without any risk of detachment.

The presence of the internal cover makes an additional layer of plastic material that occupies the inside of the frame and increases the final size of the IV. Therefore, in the case in which the internal cover is limited to the inferior part of the frame (that is, below the fastening line of the valvular structure), it does not occupy any additional space inside the frame. Here also, it is more convenient and safer to make the valvular structure and this limited internal cover in one piece.

In other aspects, to prevent any regurgitation of blood from the aorta towards the left ventricle during diastole, the base of the valvular structure is preferably positioned exactly at the level of the aortic annulus against the remains of distorted stenosed valve pushed apart by the inflated balloon. Therefore, there is no possibility of blood passage through the spaces between the metallic frame bars **11** below the attachment of the valvular structure.

However, to avoid any risk of leaks, the part of the frame below the fastening of the valvular structure (about 3 to 5 mm) is preferably covered by an internal cover which is preferably made with the same tissue as the valvular structure. Thus, there would be no regurgitation of blood which is a possibility when there is any space between the valvular structure fastened on the metallic frame and the line of application of the frame on the aortic annulus. The internal cover makes a sort of "sleeve" below the fastening of the valvular structure on the internal surface of the frame, covering the spaces between the frame bars of the frame at this level, thus preventing any regurgitation of blood through these spaces.

The internal cover can also have another function, i.e., it can be used to fasten the valvular structure inside the frame, as described below.

At FIG. **6***d*, the internal cover **19** is extended at its lower end **19'** to an external cover **19'** which is rolled up to be applied on the external wall of the stent **10**. The internal and external cover are molded, glued or soldered to the bars of the stent **10**.

The coupling process of the valvular structure on the frame is of importance since it has to be very strong without any risk of detachment of the valvular structure from the frame during millions of heart beats with pulsatile blood flow alternatively opening and closing the valvular structure.

The valvular structure of the invention folds to a very small size inside the frame in the compressed position of the valve and is expandable up to 20 to 23 mm diameter. Also, the valvular structure can resist the strong force exerted by the maximally inflated balloon that will powerfully squeeze it against the bars of the frame or against the internal cover, this one being squeezed directly against the bars of the frame. The junction zone is also particularly subjected to very strong pressure exerted by the inflated balloon. Furthermore, this

                                    **Exhibit A**

US 8,002,825 B2

**13**

junction zone must not tear or break off during expansion of the balloon. At this time, each part of the junction zone is squeezed against the bars but nonetheless follows the expansion of the frame.

As shown in FIG. **7**, the junction zone is, for example, a fastening line **20** which follows the design of a "zig-zag" line drawn by the intercrossing bars **11** of the frame on the internal cover **19**.

The fastening of the valvular structure to the frame can be made by sewing the internal and/or the external cover to the bars. To prevent any leakage of blood, stitches are preferably numerous and very close to each other, either as separated stitches or as a continuous suture line. Also, the stitches are made directly around the bars **11**. Furthermore, since the valvular structure is expanded together with the metallic frame, the stitches, if made as a continuous suture line, are also able to expand at the same time.

The fastening process can also be made by molding the base of the valvular structure on the frame. At this level, the bars **11** are imbedded in the coupling line of the valvular structure **14**. This mold way also concerns the internal cover **19**, when it goes below the coupling line **14** on the frame over few millimeters, for example, 2 to 4 mm. As mentioned above, this is intended in order to prevent any regurgitation of blood just below the lower part of the valvular structure **14** in case the frame **10** would not be exactly positioned on the aortic annulus but at few millimeters away.

The fastening process can further be made by gluing or soldering the valvular structure on the bars with sufficiently powerful biocompatible glues. The same remark can be made concerning the internal cover of the frame below the coupling line of the valvular structure.

Also, this allows the coupling line to follow the frame changes from the compressed position to its expanded one.

The valvular structure can also be fastened on the internal cover previously fixed at the total length of the internal surface of the metallic frame. The internal cover constitutes therefore a surface on which any type of valvular structure be more easily sewed, molded or glued. Because it is a structure with a large surface and is not involved in the movements of the valvular tissue during systole and diastole, the internal cover is more easily fastened to the internal surface of the frame.

In the particular embodiment shown in FIGS. **8a** and **8b**, the internal cover **19** is fastened, after introduction (indicated by the arrow B), at the upper and lower extremities of the frame **10** on the upper and lower zig-zag lines of the intercrossing bars **11**. In fact, the fastening of the internal cover **19** on the zig-zag lines made by the intercrossing bars **11** of the frame allows an easier passage of blood from the aorta above the IV towards the coronary ostia. Indeed, the blood can find more space to flow into the coronary ostia by passing through the lowest point of each triangular space made by two intercrossing bars **11**, as indicated by the arrows A1 (see also FIG. **1b**).

The fastening of the internal cover **19** on the extremities can be reinforced by various points of attachment on various parts of the internal surface of the frame **10**. The internal cover **19** can be fastened by sewing, molding or gluing the bars **11** onto the frame.

Fastening the valvular tissue (and the cover tissue below) on the inside of the frame, requires work on the frame in its expanded position to have access to the inside of this cylindric frame. In a preferred embodiment the frame is expanded a first time for fastening the valvular tissue on its bars, then

**14**

compressed back to a smaller size to be able to be introduced via arterial introducer and finally expanded again by the balloon inflation.

Since it is aimed at being positioned in the heart after having been introduced by a catheterization technique by a transcutaneous route in a peripheral artery, mainly the femoral artery, the IV should preferably have the smallest possible external diameter. Ideally, it should be able to be introduced in the femoral artery through a 14 F (4.5 mm) size arterial introducer which is the size of the arterial introducer commonly used to perform an aortic dilatation. However, a 16 F (5.1 mm) or even a 18 F (5.7 mm) introducer would also be acceptable.

Above this size, the introduction of the IV in the femoral artery should probably be done by a surgical technique. This is still quite acceptable since the surgical procedure would be a very light procedure which could be done by a surgeon with a simple local anaesthesia. It has to be recalled that this technique is used to position big metallic frames, about 24 F in size (7.64 mm in diameter), in the abdominal aorta for the treatment of aneurysms of the abdominal aorta. In that situation, this necessitates surgical repair of the artery after withdrawal of the sheath (M. D. Dake, New Engl. J. Med. 1994; 331:1729-34).

Ideally, an IV should be able to last several tenths of life years without defect, like the mechanical prosthetic valves which are currently implanted by the surgeons. Nevertheless, an implantable valve that would last at least ten years without risk of deterioration would be effective for the treatment of elderly patients.

A valvular structure according to the invention is made of a supple and reinforced tissue which has a thickness to be thin enough to occupy as less as possible space in the compressed form of the valve, is pliable, and also strong enough to stand the unceasing movements under the blood pressure changes during heart beats. The valvular structure is capable of moving from its closed position to its open position under the action of the force exerted by the movements of the blood during systole and diastole, without having any significant resistance to blood displacements.

The material used for the tissue, which exhibits the above mentioned requirements, may be TEFLON® or DACRON®, which are quite resistant to folding movements, at least when they are used to repair cardiac defects such as inter-atrial or interventricular defects or when they are used to repair a valve such as the mitral valve which is subjected to high pressure changes and movements during heart beats. Also, a main point is the increasing systolo-diastolic movements of the valvular tissue, particularly at its junction with the rigid part of the IV, and it is therefore necessary to find the most possible resistant material tissue.

As mentioned previously, the valvular structure can also possibly be made with biological tissue such as the pericardium, or with porcine leaflets, which are commonly used in bioprosthetic surgically implanted valves.

Moreover, the valvular prosthesis of the present invention does not induce any significant thrombosis phenomenon during its stay in the blood flow and is biologically neutral.

To prevent the risk of thrombus formation and of emboli caused by clots, a substance with anti-thrombic properties could be used, such as heparine, ticlopidine, phosphorylcholine, etc., either as a coating material or it can be incorporated into the material used for the implantable valve, in particular, for the valvular structure and/or for the internal cover.

The valvular structure of the invention can have several types of designs and shapes. Besides the example illustrated in FIGS. **4** and **5**, examples of strengthened valvular struc-

Exhibit A

US 8,002,825 B2

15                                                                              16

tures according to the invention are shown in FIGS. **9** to **11**, respectively in the closed (FIGS. **9***a*, **10***a*, **11***a*) and in the open state (FIGS. **9***b*, **10***b*, **11***b*) to form a prosthetic valve according to the present invention. In those figures, the frame line is simplified to clarify the drawings.

To help initiate and finalize the closure of the valvular structure, four strengthening struts **14***a* are slightly inclined from the base to the upper part as compared to the central axis XX of the structure, as shown in FIGS. **9***a* and **9***b*. Accordingly, a patterned movement of the valvular structure, during the closing and the opening phases, is initiated. This patterned movement is, in the present case, a helicoidal-type one, as suggested in FIGS. **9***b* and **10***b* by the circular arrow **21**.

FIGS. **10***a* and **10***b* illustrate another embodiment to help the closing of the valvular structure and which also involves a helicoidal movement. Represented by lines **22**, inclined pleats are formed in the tissue to impart such a movement. As illustrated, these lines have an inclination from the base to the upper part of the valvular structure tissue **14**. Pleats are formed by folding the tissue or by alternating thinner and thicker portions. The width and the number of those pleats are variable, and depend particularly on the type of material used. According to another example, these pleats **22** are combined with the above described inclined strengthening struts.

These reinforcing pleats and/or struts, rectilinear or inclined, have the advantage to impart a reproducible movement and, accordingly, to avoid the valvular structure from closing to a nonstructural collapse on the frame base.

Another shape of the valvular structure comprises two portions: one portion being flexible but with some rigidity, having a rectangular shape, occupying about one third of the circumference of the valvular structure, and the other portion being more supple, flexible and foldable occupying the rest of the circumference at its base as well as at its upper, free border. According to FIG. **11***c*, this valve is opened, during the ejection of blood, i.e., during systol. In FIG. **11***d*, a front view of the valve is closed, during an intermediate diastole, and in FIG. **11***e* the same closed valve during diastole is shown from a side view. The semi-rigid part **24'** moves little during systole and during diastole. The foldable part **23'** moves away from the rigid part during systole to let the blood flow through the orifice thus made. This orifice, due to the diameter of the upper part which is the same as that of the open stent, is large, generally as large as that of the open stent. At the time of diastole, due to the reverse of pressure, the foldable part moves back towards the semi-rigid part and presses on it, and thus closes the orifice and prevents any regurgitation of blood.

The advantage of such a valve design is to allow a large opening of the upper part of the valvular structure, not only to permit more blood flow at time of systole after the valve has been implanted, but also at the very time of implantation, when the balloon is maximally inflated to expand the valve to imbed it in the valvular annulus. The diameter of the upper part of the valvular structure could be the same size as the balloon, so that there would be no distension of the valvular part of the valve at the time of implantation, and therefore no risk of deterioration of the valvular structure by the inflated balloon.

The foldable part of the valve could be reinforced by strengthening struts to prevent an eversion of the valve towards the left ventricle during diastole.

Another shape of the valvular structure, as illustrated in FIGS. **11***a* and **11***b* comprise four portions, alternatively a main portion **23** and a more narrow portion **24**. The main and the narrow portions are facing each other. Each portion has an isosceles trapezoidal shape. The main portions **23** are flexible but with some slight rigidity and the more narrow portions **24** are compliant, more supple and foldable. In this type of design, the two slightly rigid main portions **23** maintain the valvular structure closed during diastole by firmly applying on each other in their upper extremities, thus forming a slot-like closure **25**. This particular embodiment needs less foldable tissue than in the previous embodiments and the closure of the valvular structure at the time of early diastole does not have any tendency to collapse towards the aortic annulus.

Another design for the valvular structure is a combination of a cylindrical shape followed by a truncated shape.

This type of valvular structure is longer that the hyperboloidal type, for instance, 25 or 30 mm long, therefore exceeding out of the upper part of the metallic frame, by 10 to 20 mm. The cylindrical part corresponds to the 10 metallic frame and remains inside it. The truncated conic shape is the upper part of the valvular structure, totally exceeding out of the upper extremity of the metallic frame. An advantage of such a design is that the balloon can be inflated only in the cylindrical part of the valvular structure, therefore without risk of stretching the truncated conical part of the upper diameter which is smaller than that of the inflated balloon.

When the upper extremity of the cylindrical part has the same size as the lower extremity, there is no difference during balloon inflation in the degree of force exerted by the balloon on the lower and on the upper extremity of the valvular structure. Preferably, rectilinear reinforcing struts are used in this embodiment, to strengthen the valve structure and aid in its shutting without collapsing and inverting inside the left ventricle through the aortic annulus under the force of the diastolic pressure.

Two different processes for implanting a valve according to the present invention are shown respectively in FIGS. **13***a* to **13***l* with a unique balloon catheter, as illustrated in FIGS. **12***a* and **12***b* and in FIG. **15***a* to **15***f*, with a two-balloon catheter, as illustrated in FIG. **14**.

The IV positioning in the aortic orifice and its expansion can be performed with the help of a unique substantially cylindrical balloon catheter **26** in the so-called unique-balloon catheterization technique.

Preparing for its introduction by transcutaneous route in the femoral artery, the IV **13** is, as illustrated in the perspective view of FIG. **10***a* in a compressed form crimpled on the balloon catheter **26**. A central sectional view of the mounted IV **13** on the complete balloon catheter **26** is shown in FIG. **12***b*.

The shaft **27***f* of the balloon dilatation catheter **26** is as small as possible, i.e., a 7 F (2.2 mm) or a 6 F (1.9 mm) size. The balloon **26** is mounted on the shaft **27** between two rings R. Moreover, the shaft **27** comprises a lumen **28** (FIG. **12***b*) as large as possible for inflation of the balloon **26** with diluted contrast to allow simple and fast inflation and deflation. It has also another lumen **29** able to accept a stiff guide wire **30**, for example 0.036 to 0.038 inches (0.97 mm), to help position the implantable valve with precision.

The balloon **26** has, for example, a 3 to 4 cm length in its cylindrical part and the smallest possible size when completely deflated so that it will be able to be placed inside the folded valve having an outside diameter which ranges between about 4 and 5 mm. Therefore, the folded balloon preferably has at the most a section diameter of about 2.5 to 3 mm.

The balloon is therefore made of a very thin plastic material. It is inflated with saline containing a small amount of contrast dye in such a way to remain very fluid and visible when using X-ray.

**17**

However, the balloon **26** has to be sufficiently strong to resist the high pressure that it has to withstand to be capable of expanding the folded valvular structure **14** and the compressed frame in the stenosed aortic orifice considering that, although pre-dilated, the aortic orifice still exerts a quite strong resistance to expansion because of the recoil phenomenon.

This procedure is shown in FIGS. 13a to 13e.

In contrast to the technique used when performing the usual aortic dilatation (without valve implantation), i.e., inflating the balloon maximally markedly above the nominal pressure, if possible, up to the bursting point (which occurs always with a longitudinal tear, without deleterious consequence, and with the advantage of both exerting a maximal dilating force and restoring blood ejection instantaneously), the balloon inflated for expansion of an implantable valve should not burst in any case. Indeed, bursting of the balloon would involve a risk of incomplete valve expansion and wrong positioning. Therefore, the balloon should be very resistant to a very high pressure inflation. Furthermore, the balloon is inflated only up to the nominal pressure indicated by the maker and the pressure is controlled during inflation by using a manometer. Such relatively low pressure should be sufficient prior to positioning the IV, an efficacious dilatation of the stenosed aortic valve according to the usual technique with a maximally inflated balloon for example 20 mm or 25 mm in size in such a way to soften the distorted valvular tissue and facilitate the enlargement of the opening of the valve at time of IV implantation is performed.

The implantation of the aortic valve **20** can be made in two steps, as described as follows.

The first step, as shown in FIGS. 13a to 13f, consists in introducing the shaft **27** and balloon catheter **26** along the guide wire previously positioned in the ventricle **4** (FIGS. 13a-13b). The dilatation of the stenosed aortic valve **1′, 2′** using a regular balloon catheter, according to the commonly performed procedure, i.e., with the guide wire **30** introduced in the ventricle **4** (FIG. 13a) and with maximal inflation of the balloon **26** (FIGS. 13c to 13d) up to the bursting point. Dilatation is performed at least with a balloon having about 20 mm diameter, but it can be performed with a balloon having about 23 mm diameter so as to increase maximally the aortic orifice opening before implantation of the valve although the implantable valve is about 20 mm in diameter. This preliminary dilatation of the aortic orifice helps in limiting the force required to inflate the balloon used to expand the implantable valve and position it in the aortic orifice, and also in limiting the recoil of the aortic valve that occurs immediately after balloon deflation. The balloon is deflated (FIG. 13a) and pulled back on the wire guide **30** left inside the ventricle.

Owing to the marked recoil of the stenosed valve and also of the strong aortic annulus, the 20 mm diameter valve is forcefully maintained against the valvular remains at the level of the aortic annulus. Preliminary dilatation has another advantage in that it permits an easier expansion of the IV, having a lower pressure balloon inflation which helps prevent damage of the valvular structure of the IV. This also facilitates the accurate positioning of the prosthetic valve.

The second step corresponds to the implantation of the valve **13** is shown in FIGS. 13g to 13l. The positioning of the IV needs to be precise at a near 2 or 3 mm, since the coronary ostia **6** has to remain absolutely free of any obstruction by the valve **13** (FIGS. 13k and 13l). As mentioned above, this is, for example, performed with the help of the image of the sub-valvular angiogram in the same projection fixed on an adjacent TV screen. The expansion and the positioning of the valve prosthesis **13** is performed within a few seconds (15 to

**18**

20 among at most) since during the maximal balloon inflation (which has to be maintained only a very few seconds, 3, 4) the aortic orifice is obstructed by the inflated balloon **31** and the cardiac output is zero (FIG. 13h). As for the pre-dilatation act itself, the balloon **26** is immediately deflated within less than 5 or 6 seconds (FIG. 13j) and, as soon as the deflation has clearly begun, the closing and opening states of the IV are active whereas the balloon is pulled back briskly in the aorta (FIGS. 13j to 13l). In case the IV is not maximally expanded by the first inflation, it is possible to replace the balloon inside the IV and to reinflate it so as to reinforce the expansion of the IV.

The IV **13** can also be used in aortic regurgitation. This concerns more often younger patients rather than those with aortic stenosis. The contraindication to surgical valve replacement is often not due to the old age of the patients, but stems mainly from particular cases where the general status of the patient is too weak to allow surgery, or because of associated pathological conditions. Apart from the fact that there is no need for a preliminary dilatation, the procedure of the valve implantation remains approximately the same. The balloon inflation inside the IV is chosen accordingly, taking also into account the fact that it is necessary to overdilate the aortic annulus to obtain a recoil phenomenon of the annulus after balloon deflation to help maintain the IV in position without any risk of displacement.

However, the size of the expanded implantable valve is around 25 to 30 mm in diameter, or even bigger, because the aortic annulus is usually enlarged. A preliminary measurement of the annulus will have to be performed on the sub-valvular angiography and by echocardiography to determine the optimal size to choose.

The IV can be used in the mitral position, mainly in case of mitral regurgitation, but also in case of mitral stenosis. Here again, the IV **20** is only described when used only in cases of contraindication to surgical valve repair or replacement. The procedure is based on the same general principles though the route for the valve positioning is different, using the transseptal route, like the commonly performed mitral dilatation procedure in mitral stenosis. The IV size is quite larger than for the aortic localization (about 30 to 35 mm in diameter when expanded or clearly above in case of a large mitral annulus, a frequent occurrence in mitral insufficiency), to be capable of occupying the mitral area. A preliminary measurement of the mitral annulus is performed to determine the optimal implantable valve size to choose. Since the introduction of the IV is performed through a venous route, almost always through the femoral vein which is quite large and distensable, the bigger the size of the IV in its compressed position is not a drawback even if the diameter size is about 6 or 7 mm. Moreover, the problem of protection of the coronary ostia as encountered in the aortic position does not exist here which therefore makes the procedure easier to be performed.

Finally, the IV can be used to replace the tricuspid valve in patients with a tricuspid insufficiency. This procedure is simple to perform since the positioning of the IV is made by the venous route, using the shortest way to place in the right position at the level of the tricuspid orifice practically without any danger from clot migration during the procedure. A large implantable valve is used, with a diameter of about 40 mm or even larger because the tricuspid annulus is often markedly dilated in tricuspid insufficiency. Here also, as in the mitral position, the compressed IV and the catheter used can be without inconvenience, quite larger than that for the aortic position because of the venous route used.

Furthermore, it has to be noted that the IV can be used also as a first step in the treatment of patients who have contrain-

US 8,002,825 B2

19

20

dication to surgery, when they are examined for the first time, but who could improve later on after correction of the initial hemodynamic failure. The IV procedure can be used as a bridge towards surgery for patients in a weak general condition which are expected to improve within the following weeks or months after the IV procedure in such a way that they can be treated by open heart surgery later on. In the same vein, the IV procedure can be used as a bridge towards surgical valve replacement or repair in patients with a profoundly altered cardiac function that can improve secondarily owing to the hemodynamic improvement resulting from the correction of the initial valvular disease by the IV implantation.

Another technique for implantation of an aortic valve by transcutaneous catheterization uses a two-balloon catheter.

An example of this technique using the two parts IV with a two-balloon catheter **40** is shown in FIG. **14**.

Two-balloons **26** and **26'** are fixed on a unique catheter shaft **27**, said balloons being separated by a few millimeters. The two balloons are preferably short, i.e., about 2 to 2.5 cm long in their cylindrical part. The first balloon **26** to be used, carries a first frame **10** aimed at scaffolding the stenosed aortic orifice after initial dilatation. This first balloon **26** is positioned on the aorta side, above the second balloon **26'** which is positioned on the left ventricle side. The second balloon **26'** carries the expandable valve **13** which is of the type described above made of a second frame **10'** and a valvular structure **14** attached to said frame **10'**. The difference is that the second frame does not need to be as strong as the first frame and is easier to expand with low balloon pressure inflation which does not risk damaging the valvular structure **14**.

This enlarges the choice for making a valvular structure without having to face two contradictory conditions:

having a soft and mobile valvular structure **14** capable of opening and closing freely in the blood stream without risk of being damaged by a balloon inflation; and

needing a reinforced frame strong enough to be capable of resisting without any damage, a strong pressure inflation of the expanding balloon.

The shaft **27** of this successive two-balloon catheter **40** comprises two lumens for successive and separate inflation of each balloon. Indeed, an additional lumen capable of allowing a fast inflation occupies space in the shaft and therefore an enlargement of the shaft is necessary. However, this enlargement of the shaft stops at the level of the first balloon **26** since, further to said first balloon, only one lumen is necessary to inflate the second balloon **2**C, at the level of the IV which is the biggest part of the device.

Another advantage of this two part IV with a two-balloon catheter is that each set of implantable valve and balloon has a smaller external diameter since each element to be expanded, considered separately, is smaller than in combination. This allows obtaining more easily a final device with an external diameter 14 F.

The first balloon is sufficiently strong to avoid bursting even at a very high pressure inflation. This first balloon is mounted in the frame in its deflated position, prior to its introduction by the strong frame which is aimed to scaffold the dilated stenosed aortic valve. The size and shape of said frame is comparable to what has been described previously but said frame is calculated (in particular the material, the number and diameter of its bars are chosen by the person skilled in the art) to make sure that it will resist the recoil of

the dilated valve and that it will be securely embedded in the remains of the native aortic valve.

The second balloon does not need to be as strong as the first one and, therefore, can be thinner, occupying less space and being easier to expand with a lower pressure for balloon inflation. This second balloon **26'** is mounted in the valve itself which, as in the preceding description, comprises a frame to support the valvular structure and said valvular structure.

Also, the second frame **10'** does not need to be as strong as the first one. This frame can be slightly shorter, 10 mm instead of 12 mm, and its bars can be thinner. This frame can have an external surface which is a bit rough to allow better fixation on the first frame when expanded. The bars may also have some hooks to fasten to the first frame.

The valvular structure is attached on said second frame and expanded by relatively low pressure in the second balloon called hereafter the IV balloon. It does not need to be as strong as in the preceding case (IV in one part and unique balloon catheter technique) and, therefore, it occupies less space and has less risk to be damaged at the time of expansion.

This technique is shown in FIGS. **15***a* to **15***f*.

One of the problems relevant to the IV implantation procedure as described above, with the IV in one part, is the expansion at the same time by the same balloon inflation of both the frame and the valvular structure. Indeed, the frame is a solid element and the valvular structure is a relative weak one that could be damaged when squeezed by the inflated balloon.

Therefore, the valve implantation can be performed in two immediately successive steps. The first step (FIGS. **15***a*-**15***b*) corresponds to the expansion and the positioning of the first frame with the first balloon **26** wherein inflation is performed at a high pressure. The second step (FIGS. **15***d*-**15***e*) corresponds to the expansion and the positioning of the valvular structure **14** inside the frame **10'** using the second balloon **2**C. This second step follows the first one within a few seconds because, in the time interval between the two steps, there is a total aortic regurgitation towards the left ventricle which is an hemodynamic condition that cannot be maintained for more than a few heart beats, i.e., a few seconds, without inducing a massive pulmonary edema and a drop to zero of the cardiac output.

In another embodiment, the first frame to be introduced comprises the valvular structure and the second frame being stronger than the first one to scaffold the previously deleted stenosed aortic valve.

The advantage of this two step procedure would be to allow expansion and positioning of the frame part **10'** of the R **13** using strong pressure inflation of the balloon **26'** without the risk of damaging the valvular structure **14** which, for its own expansion, would need only light pressure inflation.

The method is schematically described in FIGS. **15***a* to **15***f*. A previous dilatation of the stenosed aortic valve is performed as an initial step of the procedure to prepare the distorted valve to facilitate the following steps:

1/ positioning the double balloon catheter **40** with the first balloon **26** with the frame at the level of the aortic annulus **2***a*, the second IV balloon **26'** being inside the left ventricle beyond the aortic annulus **2***a* (FIG. **15***a*);

2/ compression of the stenosed aortic valve **1'**, **2'** with the first balloon **26** having a 20 mm, preferably with a 23 mm diameter, the balloon being inflated maximally up to

US 8,002,825 B2

21

the bursting point, to prepare the IV insertion (FIG. **15***b*). Inflation lasts a few seconds (preferably 10 seconds at most) with powerful pressure being used to expand the frame and forcefully embed said frame in the remains of the dilated valve;

3/ an immediate speedy deflation of said first balloon **26** follows (FIG. **15***c*); as soon as the balloon **26** is beginning to clearly deflate, the frame **10** remaining attached to the stenosed valve **1'**, **2'**, the catheter is withdrawn to position the IV balloon **26'** inside the previously expanded frame **26** (FIG. **15***c* in which the frame **10'** is partially drawn for clarity purpose); and

4/ immediately after being well positioned, the IV balloon **26'** is promptly inflated, to expand the IV **13** (FIG. **15***c*); and/when the IV **13** is blocked inside the frame **10**, the IV balloon **26'** is deflated (FIG. **18***f*).

Finally, the whole device has to be withdrawn to allow homeostasis of the femoral artery puncture hole.

The total duration of the successive steps, particularly the time during which the balloons are inflated, and the time during which the frame is expanded whereas the valve has not yet been positioned and expanded, is about 20 to 30 seconds. This is feasible if the balloons are inflated and deflated within very a few seconds, 6 to 8, for instance. This is permitted if the lumen of the shaft can be sufficiently large, taking into account the inescapable small diameter size of the shaft. This can also be facilitated by a device producing instantaneously a strong inflation or deflation pressure.

What is claimed is:

**1**. A prosthetic valve for implantation in a stenosed aortic valve, comprising:

a metallic frame having intersecting bars, the frame being compressible to a compressed external diameter capable of being introduced through an 18 French arterial introducer and into a patient's vasculature using a catheterization technique, the frame being expandable for implantation in the stenosed aortic valve, the intersecting bars of the frame having a diameter in the range of 0.1 to 0.6 mm for providing the frame with sufficient radial strength to resist the recoil force exerted by the stenosed aortic valve, the frame having an upper extremity formed with a zig-zag shape and a lower extremity formed with a zig-zag shape;

a flexible valvular structure made with pericardial tissue, the valvular structure sewn to the frame with stitches made directly around the bars of the frame, the valvular structure positioned entirely between the upper and lower extremities of the frame when in a closed position; and

an internal cover made with pericardial tissue and sewn to the frame, the internal cover fastened on an internal surface of the frame for preventing a passage of blood through spaces between the bars of the frame, the internal cover having an inlet end sewn to the lower extremity of the frame along a zig-zag line, the internal cover having an outlet end sewn to the valvular structure;

wherein the internal cover extends between the lower extremity of the frame and the valvular structure and wherein blood is permitted to pass through spaces in the frame between the valvular structure and the upper extremity of the frame.

22

**2**. The prosthetic valve of claim **1**, wherein the internal cover strengthens the fastening of the valvular structure to the frame.

**3**. The prosthetic valve of claim **1**, wherein the frame comprises a concave shape profile.

**4**. The prosthetic valve of claim **1**, wherein the valvular structure forms a continuous surface and is provided with guiding means.

**5**. The prosthetic valve of claim **4**, wherein the guiding means create stiffened zones which induce the valvular structure to follow a patterned movement when moving from the closed position to the open position.

**6**. The prosthetic valve of claim **5**, wherein the guiding means are further configured to prevent eversion of the valvular structure.

**7**. The prosthetic valve of claim **1**, wherein the frame is configured to be expanded by a balloon.

**8**. The prosthetic valve of claim **1**, wherein the frame is further compressible to a compressed external diameter capable of being introduced through a 16 French arterial introducer.

**9**. The prosthetic valve of claim **1**, wherein the frame is further compressible to a compressed external diameter capable of being introduced through a 14 French arterial introducer.

**10**. The prosthetic valve of claim **1**, wherein a substance with anti-thrombotic properties is incorporated into the valvular structure.

**11**. The prosthetic valve of claim **1**, wherein the frame constitutes a grate type structure.

**12**. The prosthetic valve of claim **1**, wherein the upper and lower extremities of the frame are rounded and smooth.

**13**. The prosthetic valve of claim **1**, wherein the frame comprises an expanded external diameter of about 20 to 25 millimeters for contacting the stenosed aortic valve after the prosthetic valve is implanted.

**14**. A prosthetic valve for implantation in a stenosed aortic valve by a catheterization technique, comprising:

a compressible and expandable frame made with intersecting metallic bars, the frame having a compressed external diameter capable of being introduced into a patient's vasculature through an 18 French arterial introducer using a catheterization technique, the intersecting metallic bars of the frame having a diameter in the range of 0.1 to 0.6 mm for providing the frame with sufficient radial strength to resist the recoil force exerted by the stenosed aortic valve, the frame being expandable to a shape comprising a concave profile and having an upper extremity formed with a zig-zag shape and a lower extremity formed with a zig-zag shape;

a flexible valvular structure having open and closed states, the valvular structure sewn directly to the frame between the upper and lower extremities of the frame, the valvular structure made with pericardial tissue and positioned entirely between the upper and lower extremities of the frame when in the closed position; and

an internal cover made with pericardial tissue and sewn to the frame, the internal cover fastened on an internal surface of the frame for preventing a passage of blood through spaces between the bars of the frame, the internal cover having an inlet end sewn to the lower extremity of the frame along a zig-zag line, the internal cover having an outlet end sewn to the valvular structure;

US 8,002,825 B2

23

wherein the internal cover extends only between the lower extremity of the frame and the valvular structure.

**15**. The prosthetic valve of claim **14**, wherein the frame is further compressible to a compressed external diameter capable of being introduced through a 16 French arterial introducer.

**16**. The prosthetic valve of claim **14**, wherein the upper and lower extremities of the frame are rounded and smooth.

**17**. The prosthetic valve of claim **14**, wherein the internal cover strengthens the fastening of the valvular structure to the frame.

24

**18**. The prosthetic valve of claim **14**, wherein the frame is configured to be expanded by a balloon.

**19**. The prosthetic valve of claim **14**, wherein a substance with anti-thrombotic properties is incorporated into the valvular structure.

**20**. The prosthetic valve of claim **14**, wherein the frame constitutes a grate type structure.

\*   \*   \*   \*   \*

**Exhibit A**

*Medtronic Corevalve LLC, etc., et al. vs. Edwards Lifesciences Corporation, et al.*
**US District Court, Central District of California, Case No. SA CV 11-00961 JVS (MLGx)**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2011, I electronically filed the document

described as **Answer and Counterclaims – Demand for Jury Trial** with the Clerk of the

Court using the CM/ECF System which will send notification of such filing to the

following:

| | |
|---|---|
| David Martinez, Esq.<br>DMartinez@rkmc.com<br>ROBINS, KAPLAN, MILLER<br> & CIRESI L.L.P.<br>2049 Century Park East, Suite 3400<br>Los Angeles, CA 90067-0130 | <u>Attorneys for Plaintiffs Medtronic</u><br><u>Corevalve LLC, Medtronic CV</u><br><u>Luxembourg S.A.R.L., and Medtronic</u><br><u>Vascular Galway Ltd.</u><br><br>Phone:      (310) 552-0130<br>Facsimile:  (310) 229-5800 |
| Jan M. Conlin, Esq. (*pro hac vice*)<br>JMConlin@rkmc.com<br>Stacie E. Oberts, Esq. (*pro hac vice*)<br>SEOberts@rkmc.com<br>Lauren E. Wood, Esq. (*pro hac vice*)<br>LEWood@rkmc.com<br>ROBINS, KAPLAN, MILLER<br> & CIRESI L.L.P.<br>2800 LaSalle Plaza<br>800 LaSalle Avenue<br>Minneapolis, MN 55402-2015 | Phone:      (612) 349-8500<br>Facsimile:  (612) 339-4181<br>Emails: |
| Catherine Nyarady, Esq. (*Pro Hac Vice*)<br>cnyarady@paulweiss.com<br>John Nathan, Esq. (*Pro Hac Vice*)<br>jnathan@paulweiss.com<br>Brian Eagan, Esq. (*Pro Hac Vice*)<br>began@paulweiss.com<br>PAUL WEISS<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>United States | <u>Attorneys for Defendants</u><br><u>Edwards Lifesciences Corporation,</u><br><u>Edwards Lifesciences LLC, and</u><br><u>Edwards Lifesciences (U.S.) Inc.</u><br><br>Phone:  (212) 373-3000<br>Fax:      (212) 757-3990<br>Emails: |

Dated:  September 19, 2011                    SNELL & WILMER L.L.P.


By:  *s/Deborah S. Mallgrave*
       Deborah S. Mallgrave
       Attorneys for Defendants
       Edwards Lifesciences Corporation,
       Edwards Lifesciences LLC, and
       Edwards Lifesciences (U.S.) Inc.

Snell & Wilmer<br>L.L.P.<br>LAW OFFICES<br>600 Anton Boulevard, Suite 1400<br>Costa Mesa, California 92626-7689<br>(714) 427-7000